UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
JUDITH ANNE SILVER, Special Administrator of the
ESTATE OF HEDWIG E. STERN

                         Plaintiff,

        vs.                                    ECF Case

BASIL AND ELISE GOULANDRIS FOUNDATION,      Case No.
THE METROPOLITAN MUSEUM OF ART, PETER
JOHN GOULANDRIS, WILTON TRADING SA,          **Demand for Jury Trial**
and JOHN DOE(S) 1-100

                      Defendants.
------------------------------------------------------------------------x

## <u>COMPLAINT</u>

Plaintiff Judith Anne Silver ("Plaintiff"), Special Administrator of the Estate of Hedwig E. Stern (the "Estate"), by her attorneys Freedman Normand Friedland LLP, as and for her Complaint against the Basil and Elise Goulandris Foundation (the "BEG"); the Metropolitan Museum of Art, (the "Met"); Peter John Goulandris ("Peter"); Wilton Trading S.A. ("Wilton") (the BEG, Peter and Wilton are referred to jointly as the "Goulandris Defendants"); and John Doe(s) 1-100 (collectively, "Defendants") alleges as follows:

### <u>Nature of the Action</u>

1.      In this action, Plaintiff seeks restitution of a renowned work of art by Vincent Van Gogh ("Van Gogh") entitled *Olive Picking*, 1889, 73 x 92 centimeters (the "Painting"). The Painting was looted from the collection of Fritz and Hedwig Stern (the "Sterns"), a Jewish married couple who lived in Munich, Germany until December 1936. In 1936, as a result of Nazi persecution, the Sterns and their six children were forced to flee from Germany to the United States. Before the family's emigration, the Nazi government declared the Painting to be "German cultural property" and prohibited the Sterns from bringing the Painting (and others in their

collection) with them abroad. After obtaining permission from a Nazi official, a "trustee" appointed by the Nazis sold the Painting in Germany on the Sterns' behalf, but the proceeds of the sale were deposited in a "blocked account," which the Nazis later confiscated. Upon information and belief, the Painting is now on prominent display in the museum of the BEG in Athens.

2.     In the decades since the end of World War II, this Nazi-looted Painting has been repeatedly and secretly trafficked, purchased and sold in and through New York. First, in 1956, the Met acquired the Painting from the New York gallery M. Knoedler & Co. ("Knoedler"). Then, in 1972, it was sold via the Marlborough Gallery ("Marlborough") to members of the Goulandris family and entities owned and controlled by them—first to Basil Goulandris ("Basil"), then to Wilton, and then to the BEG, for their individual and mutual benefit, and to obscure its whereabouts from Plaintiff.

3.     As early as 2003, Plaintiff provided evidence to the BEG of the Estate's rights to the Painting and made a demand upon the BEG to return to the Estate this valuable family heritage. The BEG has refused to return the Painting to the Estate.

4.     Specifically, Plaintiff asserts claims for replevin, conversion and unjust enrichment seeking restitution and damages (i) from the Met for the value it derived from its possession and use of the looted Painting from 1956 to 1972 and the proceeds it received when it sold the Painting in 1972, (ii) from the Goulandris Defendants for the value and proceeds they received from their possession, use, transfers and sales of the Painting from 1972 to date, and (iii) from the BEG, which, upon information and belief, is the current possessor of the Painting, for the return of the Painting.

**Parties**

5.      Hedwig E. Stern ("Hedwig") was born in Germany on April 29, 1898. She lost her German citizenship pursuant to the Nuremburg Laws of September 15, 1935. In 1936, as a result of Nazi persecution, she and her family fled from Germany to California, where she resided until her death on January 2, 1987 in Santa Monica, California. On or about October 8, 1943, she became a citizen of the United States. The Estate was probated in the Superior Court of California, County of Los Angeles, Probate Division ("California Probate Court").

6.      Judith Anne Silver ("Silver") was appointed by order of the Superior Court of California, County of Los Angeles on December 21, 2023 as a Co-Special Administrator of the Estate (the "2023 Order"), and the letters of administration were filed and issued on December 26, 2023. The 2023 Order provides that "[t]he special administrators are authorized to commence and maintain or defend suits and other legal proceedings on behalf of the decedent and the estate. Specifically, the special administrators are authorized to take any and all actions to pursue the decedent's claims to art that she owned which [w]as confiscated or looted by Nazi Germany." By order dated September 29, 2025 (the "2025 Order"), Silver was expressly authorized by the California Probate Court "to act alone to file this lawsuit on behalf of the Estate in New York to preserve the Estate's right to recover the Painting." Silver is also one of the beneficiaries of the Estate. Silver is a citizen of California and a resident of Oakland, California.

7.      Defendant the BEG is, upon information and belief, a Greek non-profit organization with branches in Andros and Athens, Greece. Upon information and belief, the BEG was founded in 1979, and it is administered by a six-member Board of Trustees. Its aims include the operation of the BEG's museums and the promotion of visual arts at the national and international level.

8.      Upon information and belief, the BEG currently owns and operates a museum of modern art in Athens, located at 13 Eratosthenous Street, and another, older museum in Chora on the island of Andros, located on a street called "Basil and Elise Goulandris str." Andros is "a small rocky island in the Aegean," the northernmost of the Cyclades island group, and the birthplace of Basil. Upon information and belief, the Painting is currently being exhibited at the Athens location.

9.      Upon information and belief, Basil and his wife Elise Goulandris ("Elise") for many years resided in New York, New York, where Basil operated a shipping business. Upon information and belief, they lived in an apartment at 998 Fifth Avenue, across the street from the Met, where they entertained the highest levels of New York's society. Basil and Elise died without issue (meaning no children were born of their marriage) 1994 and in 2000, respectively.

10.     Upon information and belief, Defendant Peter John Goulandris, who is a surviving nephew of Basil, has for many years resided at 993 Fifth Avenue in New York City and/or elsewhere in New York. Upon information and belief, he has acted in and from New York individually and on behalf of Goulandris family members and entities in connection with the transfers of the Painting. He is a member of the Board of Trustees of the BEG, and upon information and belief, executes his duties as a member of that Board in and from New York.

11.     Defendant the Met is a New York not-for-profit corporation operating as a public museum located in New York County, New York. The Met purchased the Painting in 1956, exhibited it in the museum, and sold it in 1972.

12.     Upon information and belief, Defendant Wilton is a Panamanian company allegedly domiciled in The Bahamas. Upon information and belief, Wilton is owned and controlled by Peter Goulandris. Upon information and belief, Basil purported to sell the Painting to Wilton

through transactions entered into and through New York in 1985 and 1988. Upon information and belief, Wilton either still "owns" and controls the Painting or sold, donated or gifted it to the BEG.

## PRIOR PROCEEDING

13.    An action seeking similar relief was initially brought in the U.S. District Court for the Northern District of California against certain of the Defendants in December 2022. On September 5, 2024, the case was dismissed without prejudice for lack of personal jurisdiction in California over the named defendants in that action: the Met, the BEG and Peter. An appeal was dismissed by the Ninth Circuit Court of Appeals by order dated May 5, 2025.

## JURISDICTION

14.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Jurisdiction of this Court arises under § 1332(a)(1)-(3), because (i) there is complete diversity of citizenship between the Plaintiff the Estate (Hedwig was a citizen of California at the time of her death) and Defendants (who are citizens of New York, the Bahamas and Greece), and (ii) the Painting is worth more than $75,000.

15.    Venue in this District is proper under 28 U.S.C. §1391(b)(2) with respect to all Defendants because a substantial part of the events and omissions giving rise to the claim occurred in New York; the Met is located in New York; and Peter is a resident of New York.

16.    The Court has personal jurisdiction over the BEG pursuant to CPLR 302 because, as detailed below, the BEG, by itself and through its agents, has transacted business in New York; and the claim arose out of BEG's purchases, transfers and/or sales of the Painting in New York; and the BEG engaged in tortious acts with respect to the Painting in New York.

17.     The Court has personal jurisdiction over the Met pursuant to CPLR 301 and 302 because, as detailed below, it is located in New York; it purchased, exhibited and sold the Painting in New York; and it engaged in tortious acts with respect to the Painting in New York.

18.     The Court has personal jurisdiction over Peter pursuant to CPLR 301 and 302 because, as detailed below, he lives in New York; the claim arose out of his transaction of business in New York, individually and on behalf of the other Goulandris entities; he purchased, transferred and sold the Painting in New York; and he engaged in tortious acts with respect to the Painting in New York.

19.     The Court has personal jurisdiction over Wilton pursuant to CPLR 302 because, as detailed below, this claim arose out of the Wilton's, on its own behalf and on behalf of the Goulandris entities', transaction of business in New York; it purchased, transferred and/or sold the Painting in New York; and it engaged in tortious acts with respect to the Painting in New York.

## STATUTE OF LIMITATIONS

20.     This case is governed by the Holocaust Expropriated Art Recovery Act of 2016 (the "HEAR Act"), Pub. L. 114–308 (2016), which provides in Section 5 that "a civil claim or cause of action against a defendant to recover any artwork or other property that was lost during the covered period [January 1, 1933-December 31, 1945] because of Nazi persecution may be commenced not later than 6 years after the actual discovery by the claimant . . . of (1) the identity and location of the artwork or other property; and (2) a possessory interest of the claimant in the artwork or other property." This action is timely because it has been commenced not later than six years after the actual discovery by Plaintiff of the location of the artwork.

## ALLEGATIONS RELEVANT TO ALL CLAIMS

### The Sterns' Ownership of the Painting

21.    Prior to World War II, Hedwig and her husband Fredrick M. Stern ("Fritz") were Jewish residents of Munich, Germany. Fritz worked as a representative ("*Prokurist*") at S. Eichengrün & Co., Munich, a textile and fashion company owned by Hedwig's father. During their lives, the Sterns acquired valuable artworks, including paintings by Van Gogh, Camille Pissarro, Gustave Courbet, Maurice de Vlaminck and Pierre-Auguste Renoir.

22.    The Sterns purchased the Painting in August 1935 from Justin K. Thannhauser ("Thannhauser"). Thannhauser and/or his firm Moderne Galerie Heinrich Thannhauser had acquired the Painting earlier in 1935 from Alfred Wolff, a German non-Jewish resident of Munich, banker and art collector, who owned it from approximately 1912 until 1935.

23.    In a November 1936 letter to their attorney, the Sterns described the Painting as "*Olivenernte*" ("Olives harvest") and mentioned that it was "purchased in August 1935." In a December 1936 letter to the art dealer Adolf Alt (described in more detail in ¶44 below) regarding the potential sale of their property left behind in Germany, the Sterns listed "Van Gogh, *Die Obstpflückerinnen*" as one of their "oil paintings . . . packed in a wooden box in a steel cabinet" at a bank in Munich. A January 1937 letter to the Galerie Thannhauser from the "trustee" appointed by the Nazis to oversee the sale of the Sterns' property lists "van Gogh (*Olivenernte*)" as one of the Sterns' paintings that could not be moved out of Germany. In the claim that the Sterns filed with the German government in 1948 regarding their lost property, the Sterns wrote, "Until November 1936 we lived in Munich, Germany, Keplerstrasse 18. Among our possessions were also the pictures mentioned below: 1) Van Gogh: *Olivenernte* . . . ." And in a 1957 statement under oath before the German government regarding her family's lost property, Hedwig stated, "When

my husband, Fritz Stern, now deceased, and I emigrated to the U.S.A. with our 6 children in

December 1936, we had in our possession five paintings by French Impressionists: van Gogh:

Olive Picking. . . ."

**The Sterns' Persecution by the Nazis**

24.      Beginning in 1933, the world the Sterns knew in Germany began to shatter. Adolf

Hitler came to power and quickly began to enact and enforce racist laws directed against Jews.

Key to the Nazis rule was, as Reichsmarschall Hermann Göring, put it, "getting rid of the Jews,

but keeping their assets."

25.      As early as 1934, the Nazi government laid the groundwork for its persecution of

Jewish people by declaring that German tax law be interpreted according to the National-Socialist

ideology. As a result, Jews and other persecuted groups lost all legal recourse against

discriminatory tax treatment and legislation. Subsequently, the Nazis used taxes, particularly the

flight tax ("*Reichsfluchtsteuer*"), to strip Jews of their assets.

26.      Moreover, as Jews began to emigrate out of Germany after Hitler's accession to

power, the Nazi government tightened flight tax regulations—lowering the threshold for payment

and authorizing the tax offices to require security deposits. These regulations were critical in

dispossessing emigrants and would-be emigrants, and were used to put Jews, especially wealthy

ones, under surveillance by the foreign exchange authorities (the "*Devisenstelle*").

27.      On September 15, 1935, the Nazi government enacted "The Laws for the Protection

of German Blood and German Honor," also known as the Nuremberg Laws. The Nuremberg Laws

formalized the exclusion of Jews from Germany's economic and social life and, eventually, their

complete dispossession. Specifically, the Laws deprived all German Jews, including the Sterns, of

the rights and privileges of German citizenship, ended any normal life or existence for Jews in

Germany and relegated all Jews to a marginalized existence, a first step toward their mass extermination.

28.     Through the "Aryanization" process, Jewish-owned businesses were taken over by "Aryans," or non-Jews, and Jews were forced to surrender virtually all of their assets. Pursuant to the Four-Year Plan of 1936, the Nazis appointed "trustees" to liquidate Jewish-owned property and sell it for the benefit of the Nazi Reich.

29.     Further, the Reich tightened foreign exchange regulations, imposed the death penalty on attempts to undercut these regulations, and codified the authority of the *Devisenstelle* (the Reich's currency or exchange control office) to block the assets of persons evading or intending to evade the regulations. Critically, the Reich used "blocked accounts" to strip Jews of their property and assets. The *Devisenstelle* was granted the power to place Jewish individual's assets into blocked accounts if the individual was even suspected of intending to emigrate; the individual could only dispose of the assets with the approval of the *Devisenstelle*. The only legal transfers of currency abroad from blocked accounts could be made via the *Deutsche Golddiskontbank* (the "DeGo"), the government bank which made foreign exchange transactions at increasingly large discounts. In 1937, the discount charged by the DeGo exceeded 80%.

30.     Blocked accounts gave the appearance of émigrés being allowed to take their assets abroad; in fact, Jews who fled Germany rarely recovered any of the funds deposited in their blocked accounts. Instead, the funds were seized by the Nazi state. As described below, the Sterns suffered this exact fate after they fled Germany for the U.S.

31.     The Reich also seized assets from fleeing Jews using the flight tax. Flight tax assessments were based on wealth tax declarations, and, as of the Sterns' emigration in 1936, were calculated at 25% of the value of the previous year's reported assets. Payment of the flight tax did

not give the emigrant any right to transfer abroad any assets that remained after payment of the tax. In fact, the flight tax typically would have been higher than 25% of the assets owned at the time of emigration because families like the Sterns who were persecuted by the Nazis suffered dramatic financial losses in the period leading up to their emigration. As a result, their assets at the time of emigration would have been considerably smaller than those on which their flight tax was assessed. Fleeing Jews were required to pay the flight tax obtain a no-objection certification of the tax authorities, which was, in turn, required to obtain an exit permit.

32.    By the end of 1936, the Reich had established an oppressive, ever-tightening network of financial regulation—including taxes, charges, and foreign exchange restrictions—which was designed to seize most, and subsequently all, Jewish-owned assets. With the adoption of these laws and the accompanying increase in physical violence against Jews, the persecution of Jews in Germany was growing at an alarming rate.

**The Sterns' Emigration to Save Their Lives and the Nazis' Looting of the Painting**

33.    As early as 1933, the Sterns began to experience an increasingly violent, antisemitic environment in their home country. In March 1933, the Sterns traveled by train to Zweibrücken, Germany, a city on the French/German border, to bury Fritz's mother, Lina Stern. Hedwig later described that "all the streets were full of people shouting '*Heil Hitler*,' '*Sieg Heil*,' et cetera." After the funeral, on a return train to Frankfurt, Fritz was arrested, removed from the train, his luggage was searched, and he was taken to the police station. The military commander at the police station knew Fritz from growing up and asked him why he was on the train. When Fritz was released after questioning, the Sterns were forced to return their train tickets and were not allowed to take a train that went through France to Frankfurt; they had to take a longer train instead.

34.     By the end of 1935, several of the Sterns' children could no longer attend their schools in Germany and were forced to switch to a separate school for Jewish children. Hedwig later described that in a German countryside town where her parents had a home, "big banners were stretched across the streets, which said '*Juden raus*' ('Jews get out')."

35.     Throughout 1935, faced with antisemitic laws, the growing threat of violence, the risk of imprisonment, deportation and death, and to avoid the loss of their remaining property, the Sterns, like many German Jews, prepared to emigrate to the United States.

36.     On December 9, 1935, a Reich flight tax of 118,250 Reichsmarks was assessed on the Sterns. The Sterns were also forced to pay the so-called "Jew Tax" and other punitive taxes imposed by the Nazis.

37.     On July 9, 1936, Hedwig offered the Painting for sale at the Galerie Heinemann in Munich, but it did not sell.

38.     On September 17, 1936, the Sterns applied for emigration from Germany due to their Jewish origin. The Sterns' letter to the Emigrant Consultation Office specifically stated that Fritz "has decided to emigrate because he is Jewish and, first and foremost, would like to secure the future of his six underaged children, as far as possible."

39.     On October 27, 1936, the Painting was included on a list of works that were appraised for Fritz "for the purpose of moving to America," which shows that the Sterns intended to bring the Painting (and others in their collection) with them upon their emigration.

40.     On November 1, 1936, Fritz lost his employment.

41.     In or around November 1936, the Nazis' looting of the Painting began. Hedwig later described that, after the Sterns sought permission to bring the Painting (and others in their collection) with them to the United States, the Nazis declared it "German cultural property," which

was "forcibly excluded from . . . shipment abroad." This meant that the Sterns were forced to leave the Painting, and others from their collection, behind in Germany when they fled to the U.S.

42.      On November 17, 1936, the Sterns' attorney confirmed in a letter to the Munich Regional Tax Office Foreign Exchange Office the Sterns' understanding that the Nazis were assuming control of the Painting. The attorney wrote, "Dr. Stern will not take any paintings with him, unless the Foreign Exchange Office would give special approval for taking them with him."

43.      By letter dated November 23, 1936, the Munich Tax Office informed Fritz that the Reich flight tax was paid.

44.      The Sterns further confirmed their understanding that the Nazis had taken control of the Painting by letter dated December 23, 1936, in which they wrote, "It is now a fact that we have to leave the five French paintings and the 7 etchings, here." In that letter, Hedwig asked Adolf Alt (an art dealer in Munich) to coordinate with Heinrich Eisenmann (a dealer in rare books) on her behalf to sell her artworks in Germany—because the Nazis would not permit them to be sold elsewhere. Stern informed Alt that the A. Frank & Söhne storage company in Munich had put 19 of her paintings (plus some etchings) into a crate. The Painting was number 11 on the list of 19 paintings in the crate and was described by Stern as "Van Gogh '*Die Obstplückerinnen*.'" The Sterns noted that an attorney named Kurt Mosbacher was holding a storage receipt for the crate in a bank vault, but they did not delegate any authority to Mosbacher over the sale of the paintings.

45.      On December 29, 1936, the Sterns and their children left Germany by ship from Hamburg. They arrived in New York on January 8, 1937. They then travelled to California where they remained for the rest of their lives.

**The Confiscatory Sale of the Painting in 1938**

46.     The looting of the Painting continued after the Sterns fled Germany for the United States. After the Sterns' departure, and in contravention of their selection of Alt to handle the sale of the Painting, the Nazis ordered that Mosbacher be appointed "trustee" (or "*Treuhaender*") for the Sterns.

47.     In late January 1937, Mosbacher shipped the five of the Sterns' paintings, including the Painting, to the Galerie Thannhauser in Berlin. Mosbacher included with the shipment a letter to Galerie Thannhauser identifying the Painting as "*Olivenernte*" ("Olive harvest"). Mosbacher's letter confirmed that "you will transfer the potential proceeds or purchase price to the blocked account of Mrs. Hedwig and Dr. Fritz Stern" at a bank in Munich. Mosbacher's letter also reminded Thannhauser that the Paintings were under orders by the Nazi government not to leave Germany: "custody of the pictures must remain your Berlin branch, unless, in individual cases, a shipment within Germany is to be approved."

48.     The Galerie Thannhauser, which had been owned and operated by a Jewish family, ceased operations on December 31, 1937. On January 1, 1938, Paul Römer, who had been Justin Thannhauser's business manager and who was not Jewish, "Aryanized" the Galerie Thannhauser and opened Galerie Römer in the same location. Upon information and belief, the Painting remained at Galerie Römer.

49.     A month later, in February 1938, Mosbacher requested and obtained written permission from a Nazi official to sell the Painting (together with the Renoir) to a German collector named Theodor Werner, and to transfer the sale price of 55,000 Reichsmarks into a "blocked account" at a bank in Munich under the names of Fritz and Hedwig Stern.

50. Friedrich M. Jakob signed the February 2, 1938 letter giving Mosbacher permission for the sale. Jakob was an employee at the Munich bureau of foreign exchange who had joined the Schutzstaffel, or SS (which began as Hitler's personal bodyguard service), in March 1931.Jakob's actual job in the Munich bureau of foreign exchange was to implement Hitler's policy of stealing from Jews like the Sterns who had escaped abroad. When Jakob approved the purported sale of the Sterns' two paintings and the transfer of purchase money into the blocked bank account in Munich, he wrote that the Sterns were then living in "Pasadena" (in California).

51. In or about April 1938, Werner paid 55,000 Reichsmarks for the Painting and the Renoir into the blocked account of Hedwig and Fritz Stern. Werner later (falsely) claimed he had bought the Painting from the art dealer Justin Thannhauser, but in fact he bought it from Galerie Römer (not Thannhauser) via the Sterns' Nazi-appointed "trustee" Mosbacher. It was subsequently revealed that Thannhauser was a secret **co-buyer** (not seller) of the Painting, jointly with Werner.

52. To substantiate Thannhauser's purported half-interest in the Painting, Werner signed a document dated "6. 1. 38," which stated that "Herr Thannhauser, Paris" owned a half-share interest in the Painting. This document, as discussed below, did not surface until 1947, and Plaintiff has no information or belief concerning the actual date when it was created. However, according to the "6 .1. 38" document, the purported half-half ownership structure existed "upon completion of the business deal by which we buy the painting." The document, however, does not specify when Thannhauser and Werner's "business deal" occurred, or from whom they bought the Painting.

53. On, August 22, 1938, the Gestapo ordered that "the entire property of the married couple Stern is with immediate effect provisionally confiscated." The Sterns' "provisionally confiscated" property included the blocked account containing the proceeds of the sale of the

Painting. On November 9, 1938, the day of the Kristallnacht massacre, the Sterns, along with their three children, were officially stripped of their German nationality in accordance with the Nuremberg Laws of 1935. The loss of their citizenship paved the way for the liquidation of their property. Although the Sterns had, by this time, left Germany for the United States, they were still obliged to fill out the Reich's mandatory property asset declaration. Because Hedwig's father and his wife were still living in Nazi Germany, the Sterns felt extreme pressure to comply with the Nazis' directives. On October 15, 1938, the Sterns provided their Jewish Property Declaration, which included the blocked account containing the proceeds of the sale of the Painting.

54.    On January 5, 1939, German Reich Gazette published an announcement that the "assets of the married couple Friedrich Michael Stern and Hedwig Stern née Eichengrün, deprived of German citizenship by the announcement of November 9, 1938 are declared to be forfeited to the Reich." The Sterns' forfeited assets included the blocked account containing the payment for the Painting.

55.    United States policy and New York jurisprudence recognize that the Nazis' declaration of the Painting as "German cultural property," the Nazis' refusal to allow the Painting out of Germany, the coerced sale of the Painting through a Nazi-appointed agent, and the Nazis' seizure of the Sterns' blocked account constitute a Nazi looting and/or confiscation. The 2009 Terezin Declaration on Holocaust Era Assets and Related Issues states that "art and cultural property of victims of the Holocaust (Shoah) and other victims of Nazi persecution was *confiscated, sequestered and spoliated by the Nazis*, the Fascists and their collaborators through various means including *theft, coercion and confiscation, and on grounds of relinquishment as well as forced sales and sales under duress* . . . ." The 2024 Best Practices for the Washington Conference Principles on Nazi-Confiscated Art reiterates that "'Nazi-confiscated' and 'Nazi-

15

looted' refer to what was ***looted, confiscated, sequestered, and spoliated, by the Nazis***, the Fascists and their collaborators through various means including but not limited to ***theft, coercion, and confiscation, and on grounds of relinquishment***, *as well as forced sales and sales under duress*." The Best Practices further state that "the sale of art and cultural property by a persecuted person during the Holocaust era between 1933-45 can be considered equivalent to an involuntary transfer of property based on the circumstances of the sale."

**The Post-War Transfer of the Looted Painting to New York in 1948**

56.     Sometime after the end of World War II, unbeknownst to the Sterns, the Painting was moved from Berlin and placed in the custody of Julius Weiss, an acquaintance of Mr. Thannhauser, who was living in the German city of Tübingen. Tübingen at that time was part of the French Zone.[1]

57.     In 1947, Thannhauser, who by that time was living in New York, knew or found out about the location of the Painting and sought the approval of the French government to return the Painting to him in New York. To do so, Thannhauser sent documents to the French "Commission de Récupération Artistique" ("CRA").

58.     Thannhauser's transmission to the CRA included the "6.1.38" document signed by Werner, which stated that "Herr Thannhauser, Paris" owned a half-share interest in the Painting. The document, however, concealed critical details from the French authorities, including the sale of Painting to the Sterns in 1935, the "trustee" Mosbacher's sale of the Painting to Werner, and Thannhauser's participation in Werner's acquisition of the Painting in 1938.

---

[1] After World War II, Germany was divided into four occupation zones controlled by the Allied powers: the United States, the United Kingdom, France and the Soviet Union.

59.    Thannhauser also provided to the CRA a letter of July 17, 1947, in which Thannhauser asserted that he was co-owner of the Painting and had acquired it from Alfred Wolff. In that letter, Thannhauser described himself as "[p]ossédant" ("owning") the Painting, "que j'avais acqui par Mr. A. Wolff de Munich" ("which I had acquired from Mr. A. Wolff of Munich"). The term "[p]ossédant" in the context of this letter could only have meant "owning" (rather than the secondary meaning, "possessing"), because, as the letter also acknowledged, in July 1947 Julius Weiss in Tübingen still possessed the Painting.

60.    This letter also concealed critical facts, including the facts that: the Sterns bought the Painting from Thannhauser in 1935 after Thannhauser acquired it from Wolff; the Nazis assumed control of the Painting in 1936; it was sold to Werner in 1938 with the Nazis' permission; and the proceeds of the sale were paid to a blocked account, the contents of which were confiscated.

61.    Thannhauser also submitted to CRA a letter dated "9.September 1947" and signed by Alfred Wolff. In this letter, Wolff confirmed that he sold the Painting (identified as "*Oliven - Ernte*," or "Olives - Harvest") to Thannhauser in 1935 ("*im Jahre 1935*"). Thannhauser shared this letter with the CRA to help conceal the subsequent movements of the Painting, including his own sale of the Painting to the Sterns in 1935.

62.    Based on these statements, Thannhauser deceived the French government into thinking that he and Werner were the true owners of the Painting. In a January 15, 1948 letter from the CRA to the Director of the Museums of France, the president of the CRA credited Thannhauser's statements, stating that the Painting "belongs to Mr. Théodore WERNER and Mr. THANNHAUSER . . . Mr. THANNHAUSER has given us all documents proving that he had free disposal of this painting." On the basis of these statements, Thannhauser convinced the French

government to ship the Painting to Paris in 1948; later the same year, he obtained permission to have the Painting shipped to himself in New York.

63.     Although Justin Thannhauser was Jewish and was forced to escape Germany himself, he is now widely known to have trafficked in art that was looted from or sold under duress by Jewish families fleeing Germany. The Art Loss Register has remarked that the Thannhauser "name generally does not mean good things." Several lawsuits on behalf of claimants seeking to recover looted artworks have alleged that Thannhauser bought important modern artworks through "forced transfers" or at "fire sale" prices from Jewish families seeking to raise funds to flee Germany. After the war ended, Thannhauser had business relationships with former Nazi agents and collaborators, including Cesar Mange de Hauke and Albert Skira, both of whom the U.S. State Department identified as traffickers in Nazi-looted art.

**The Sale of the Painting in New York in 1948**

64.     Sometime in 1948, or shortly after, in New York, Thannhauser sold the Painting, on behalf of himself and Werner, to Vincent Astor. Vincent Astor's wife was Brooke Astor, who served on the Board of Trustees of the Met from 1964 until 1983.

**Hedwig's Post-War Efforts to Recover the Painting**

65.     After World War II, between 1948 and 1955, the Sterns unsuccessfully pursued official claims in Germany to recover the Painting or reparations for its taking.

66.     First, on August 18, 1948, Fritz and Hedwig sent a letter to the Central Registration Office of the American Zone in Germany asking for help finding artworks looted from their family, including the Painting. They included a photo of the Painting with the letter.

67.     Then, on July 12, 1949, Hedwig submitted a compensation claim to the Bavarian Restitution Court. The Painting was part of this claim.

68.     In or about April 1951, Hedwig traveled to Germany to pursue her family's claims for their lost paintings. By letter dated April 6, 1951, S. Lane Faison, the Director of the Central Collecting Point for the recovery of Nazi-looted art in Munich, wrote to Ardelia Hall, the Fine Arts and Monuments Advisor in the Office of International Information Cultural Affairs (known as "OIC") at the United States Department of State to inform her about the Stern case and the looted Painting. Faison's letter described the Painting as "Van Gogh, 'Harvest of Olives'" that belonged to "Mrs. Fredrick M. Stern, 1890 Harding Avenue, Altadena, California." Faison wrote that the Painting could be on the U.S. market. Faison's letter makes it clear that, at the time of the letter, Hedwig was in Munich searching for the looted artworks.

69.     On or about June 11, 1951 (according to the official "RECEIVED" stamp on the reverse side), Hall obtained from Faison a copy of the February 1938 letter signed by Jakob (described in ¶50 above), which granted Mosbacher permission to sell the Painting to Werner and to deposit the sale proceeds in a blocked account. This Nazi document had referred to Hedwig and her husband as "Auswanderer[]" (or emigrants from Germany) in "Pasadena." The City of Pasadena is adjacent to Altadena, where the Sterns were then living, in Los Angeles County, California.

70.     On July 3, 1951, Hedwig met with Hall at her office at the State Department to discuss the looted artworks. Hall created a file about the Stern case.

71.     By letters dated August 29, 1951 and September 23, 1951, Hedwig wrote, on recommendation of Hall, to William R. Valentiner and to James B. Byrnes at the Los Angeles County Museum seeking information about the Painting. Hall had told Hedwig that the Los Angeles County Museum planned to make a list of European art objects that were lost during the war, though nobody at the museum knew the whereabouts of the Painting.

72.     In or by 1955, Hedwig learned that the Painting, as well as the paintings by Courbet and Renoir, had been sold to Werner. By this time, Germany required that restitution claims for artworks acquired by private individuals must be directed to those individuals, not to the government. Thus, by letter dated December 5, 1955, the Sterns' attorney Dr. Hans Raff wrote to the Bavarian Restitution Court to withdraw from the Sterns' 1949 restitution claim the Painting and two other paintings that had been sold to Werner.

73.     In or around 1955, Werner restituted the Courbet to Hedwig, but he did not have the Renoir or the Van Gogh Painting, which Thannhauser had sold to Astor in New York in 1948. Upon information and belief, Werner never informed the Sterns that the Painting ended up with Thannhauser after the war, or that he knew that it had ended up in New York.

74.     In 1955, Fritz died.

**The Met's Purchase of the Painting in 1956**

75.     Sometime in 1955, Astor consigned the Painting to Knoedler in New York.

76.     In January 1956, the Met bought the Painting from Knoedler. The invoice for the Painting was addressed to Theodore Rousseau, Jr., the Met's Curator of European Paintings, who approved the purchase of the Painting for $125,000.

**The Met Knew or Should Have Known That the Painting Was Looted**

77.     At the time of the Met's purchase of the Painting, Rousseau was the Met's Curator of European Paintings and an expert on Van Gogh. He had personally curated the Met's exhibition of 158 paintings and drawings by Van Gogh, which ran from October 1949 to January 1950.

78.     Critically, Rousseau was also one of the world's foremost experts on Nazi art looting. As a Lieutenant Commander in the U.S. Navy during and after World War II, Rousseau served in the Office of Strategic Services (the "OSS"), where he had authored a report for the Art

Looting Investigation Unit ("ALIU") of the OSS entitled "Consolidated Interrogation Report No. 2: The Goering Collection." The ALIU was part of the OSS's counter-intelligence division and acted as the intelligence component to the Monuments, Fine Arts, and Archives Section Unit, better known as the "Monuments Men." Rousseau was one of only three American officers (together with Faison and James S. Plaut) assigned to lead the elite ALIU intelligence unit in Europe, aided by a single Dutch officer. The ALIU started with only 10 men, including three enlisted men and three civilians. One more American officer reinforced the ALIU's Washington, D.C. headquarters in 1946.

79.     Quite apart from their backgrounds as students and scholars of art history, Rousseau and the other American ALIU officers received counter-intelligence training—including training and practice in methods of deception, and identifying deception by others—before assuming their duties. After their training, the unit operated in London to compile information on individuals believed to have participated in art looting; then, on or about May 20, 1945, Rousseau and Plaut deployed to occupied Germany. Faison later joined them at Berchtesgaden, Bavaria in July 1945.

80.     The ALIU operated a detention and interrogation center in Altaussee, Austria for captured Nazi functionaries and art dealers who were active in art looting and collecting.

81.     The ALIU's final report, dated May 1, 1946, contained the definitive "BIOGRAPHICAL INDEX OF INDIVIDUALS INVOLVED IN ART LOOTING." This list became commonly known as the "ALIU Red Flag Names List." "Knoedler & Cie" was on the list.

82.     Knoedler's reputation as a dealer in stolen art was well publicized. In June 1954, (while Rousseau was the Met's Curator of European Paintings), *The New York Times* reported that the District Attorney in Florence, Italy had ordered confiscation of a 15th century painting by Andrea del Castagno, which was illegally exported from Italy after World War II and sold by

Knoedler to the Met. Rousseau had authored an article five years earlier praising the Met's acquisition of the Castagno painting, so he could not possibly have failed to know about the scandal involving Knoedler.

83.    Moreover, well before the Met bought the Painting from Knoedler in or around 1955, a broad consensus had developed among American museums that museums should help the U.S government to investigate art that may have been transferred in Nazi-dominated Europe (including so-called forced or coerced transfers), and which therefore lacked "clear title."

84.    As early as 1944, the Western Allies' Military Law No. 52 provided that "any transfer, contract or other arrangement made, whether before or after the effective date of this law, with the intent to defeat or evade … the restitution of any property to its rightful owner, is null and void." Rousseau must have been aware of Military Law No. 52, from his ALIU deployment investigating art looting.

85.    Further, the American Commission for the Protection and Salvage of Artistic and Historic Monuments in War Areas (the "Roberts Commission") built awareness in the U.S. of Nazi-looted art in the years after the end of World War II. Alongside the Monuments Men, the presidentially appointed Roberts Commission was created to help the U.S. Army protect, rescue and preserve works of cultural value and significance in Allied-occupied areas of Europe and to develop inventories of Nazi-appropriated property. The Commission's work took place from 1943 to 1946.

86.    In 1945, American museums were told in a letter from the Roberts Commission that no clear title can pass on objects that had been looted from public or private collections abroad. In that same letter, museums and other institutions were requested to report to the Roberts Commission any cases where the source or origin of these objects may be obscure or suspicious

and where the objects may be of special artistic importance. Francis Henry Taylor, then the Director of the Met, was listed on this letter as a member of the Roberts Commission.

87.    On January 28, 1947, the U.S. joint State-War-Navy Coordinating Committee approved a State Department memorandum entitled "Return of Looted Objects of Art to Countries of Origin." This memorandum announced that "[t]he introduction of looted objects of art is contrary to the general policy of the United States and to the commitments of the United States under the Hague Convention of 1907 and in case of objects of a value of $5,000 or more is a contravention of Federal law." To implement the U.S. "policy," "commitments" and "Federal law," the 1947 memorandum again requested that museums "be vigilant to note objects" that "have been wrongfully taken and brought to the United States during and after the war," and also "to notify the State Department immediately of any obtainable information concerning such objects."

88.    The OIC also distributed typed copies of the January 28, 1947 memorandum directly to "Dealers Handling European Works of Art," including Knoedler and the Thannhauser Gallery in New York (addressed to "J.K. Thannhauser"), and to 64 museums, including the Met.

89.    On December 11, 1950, the State Department issued another letter informing museums that "[t]he continued vigilance of American institutions and individuals in identifying cultural objects improperly disbursed during World War II is needed." This letter requested "cooperation in notifying the Secretary of State" about "objects without a clear title." The letter was reprinted and widely distributed to museum curators in the Magazine of Art (February 1951) and the College Art Journal (Winter 1950). The OIC also sent a copy of the December 14, 1950 letter directly to the Met and to Knoedler. Rousseau was by this time a curator at the Met.

90.    The State Department issued a pair of circulars in 1951 and 1954 that made clear that all transfers of property in Nazi-dominated Europe, including so-called forced or coerced

transfers, were suspect, and that defenses, such as a buyer's claimed ignorance of a forced transfer, should not bar restitution.

91.     In an October 1954 circular, Hall identified dozens of American institutions that assisted the State Department in recovering Nazi-looted art and other cultural objects. The Met was not named. In fact, Rousseau at the Met disagreed with the general policy of the United States (to say nothing of the law and the international commitments behind this policy) that Jews should receive restitution of Nazi-looted paintings. Instead, he believed that important Nazi-looted paintings should be housed in American museums. In an August 28, 1948 article in *The New Yorker*, Rousseau stated, "I think it's absurd to let the Germans [meaning, museums in Germany] have paintings the Nazi bigwigs got, often through forced sales, from all over Europe. Some of them ought to come here." He added, "I don't mean especially to the Metropolitan, which is fairly well off for paintings, but to museums in the West, which aren't."

92.     In or about August 1955, the Met appointed a new Director, James J. Rorimer. Rorimer was a graduate of Harvard University in Fine Arts and had been a Captain in the U.S. Army, where he served as the Chief of the Monuments Men of the Seventh Army's Western Military District (in the Western part of occupied Germany). In short, by January 1956, Rousseau, Rorimer and their colleagues at the Met had the best possible knowledge and the skills to conduct provenance research on the Painting and to identify questionable or Nazi-looted art.

93.     By reason of the foregoing, in purchasing and approving the payment(s) to obtain the Painting, Rousseau and the Met knew or should have known that the Painting had probably been looted by Nazis. Even though Knoedler was on the Red Flag List, Rousseau took no action to assure himself or the Met of anything about the Painting's transfers from or within Germany during the war. Despite all the requests and circulars the Met received, Rousseau did not contact

the Secretary of State in Washington, D.C. or his former colleague Hall at OIC to inquire about the Painting. This failure was critical: as described in ¶68 above, Hedwig had been in contact with Hall about the Painting in 1951. Moreover, Faison, who had worked with Rousseau in the ALIU and introduced Hall to the Sterns' case in 1951, knew that the Painting was looted and specifically warned Hall in 1951 that the Sterns' pictures "might possibly appear on the US market." Faison was a Van Gogh scholar and after the war became a professor at Williams College in Massachusetts. He regularly visited the Met with students and must have seen the looted Painting on the museum walls. Considering Faison's connections to Rousseau and Rorimer as fellow Monuments Men, it is unlikely that Rousseau and Rorimer were not confronted by Faison about the fact that the Painting in the museum was looted.

94.     Notably, the Met announced its acquisition of the Painting in the Metropolitan Museum of Art Bulletin, but the museum did not publicize the news in *The New York Times* or elsewhere. Upon information and belief, neither Rousseau nor the Met ever reported the Painting's obscure and suspicious title to the U.S. Department of State.

95.     In late 1955, when Knoedler offered to sell the Painting on behalf of the Astors, the Astors advised Knoedler that they preferred the Painting to be sold to a museum. According to correspondence in the Knoedler archives, however, the gallery did not market the Painting to any museums, but offered it only to individuals, including Mr. and Mrs. Richard J. Bernhard. Offering the Painting to American museums would have required the museums to report the Painting's obscure and suspicious title to the government. The Painting only came to Rousseau's attention at the Met in or about December 1955 because the Bernhards offered to donate money to the Met for the purpose of acquiring it.

96.     What's more, the Met did not make any provenance information about the Painting public until 1967. That year, the Met published a catalogue that included a false provenance for the Painting, omitting entirely the Sterns' ownership of the Painting and the World War II-era transactions. The provenance listed in the Met's 1967 catalogue stated:

> [Ambroise Vollard, Paris];
> Dr. Alfred Wolff, Munich (in 1912);
> [J. K. Thannhauser, c. 1948];
> Vincent Astor, New York (until 1955);
> [M. Knoedler, New York, 1955-1956].
> PURCHASE, MR. AND MRS. RICHARD J. BERNHARD FUND, 1956.

97.     To senior, elite Monuments Men such as Rousseau or Rorimer, even this false provenance, and other critical facts about the Painting, should have raised bright red flags for the Met. First, the Painting was a highly prominent Post-Impressionist work that the Nazis had condemned as "degenerate." Second, the provenance notes that the Painting was likely present in Germany when it was under Nazi control (*i.e.*, with Wolff in Munich after 1912, possibly until "c. 1948," since no place or country is mentioned next to the date "c. 1948"). Third, the provenance notes that the Painting changed hands immediately post-war—the notation "c. 1948" suggests the transaction took place "in approximately" 1948, which should have raised the question of when and where that transaction took place. This provenance does not exclude the possibility of this transaction having taken place during the Holocaust, maybe in Germany. Finally, the false provenance identifies the involvement of Knoedler, which, as described above, was included on the ALIU Red Flag List. The Met knew or should have known that this provenance suggested that the Painting was (or probably was) looted.

**The Met's Sale of the Painting in 1972**

98.     In 1972, the Met took steps to sell the Painting. Rousseau and the Met's actions in connection with that sale further evince that they knew or should have known that the Painting had probably been looted by the Nazis.

99.     Upon information and belief, the Met never offered the Painting to other institutions or at public auction. As Rousseau and the Met would have known, offering the Painting to another institution in 1972 (or any time since the Roberts Commission's 1945 request for museums' help identifying looted art) would have likely triggered the other institution to report the Painting's obscure and suspicious title to the U.S. government.

100.     The Met confirmed in 2007 that, on May 2, 1972, it sold the Painting to the "Marlborough Art Gallery, 41 East 72nd Street, New York, NY."

101.     Upon information and belief, later in 1972, Marlborough sold the Painting to Basil and Elise Goulandris.

102.     Upon information and belief, the Art Dealers Association of America condemned the Met's 1972 sale of the Painting as a breach of the public trust.

103.     The Met's explanations for the secret sale of the Painting were false, pretextual and in some instances, contradictory. First, Thomas P. F. Hoving, then the Met's Director, told *The New York Times* that the paintings had been sold to help finance purchases of other artworks, including Velazquez's *Juan de Pareja*. That was false: the Met had purchased that Velazquez painting in 1970 with funds from an endowed donation and from individual trustees.

104.     In its 1971-72 Annual Report, the Met stated its "policy of removing from [its] collections and preparing for sale or exchange objects that are either duplicates which would better serve other institutions or that are no longer considered to be of sufficient quality for exhibition in

[the Met's] galleries." This statement was not true with respect to the Painting because, upon information and belief, the Met never offered it to any other institutions. The Met's failure to follow its own policy with respect to the Painting is further evidence that it was concerned that another institution would report the Painting as looted.

105.    In June 1973, the Met published its "Report on Art Transactions 1971-1973." In that publication, Rousseau, speaking as the Met's Chief Curator, described the Painting as "the weakest Van Gogh in the museum's collection. It was in no sense an example of the artist's best efforts nor does it approach the quality of the nine other Van Gogh's held by the museum." He stated further that it was "the least interesting of a series of four pictures of the same subject."

106.    But Rousseau's statement contradicted the Met's description of the Painting in the 1967 catalogue, which boasted of its "vigor and freshness" compared to similar scenes by Van Gogh. In fact, the Painting was considered superior to the one the Met subsequently acquired in 1995. Rousseau's 1973 statement also contradicted his introduction to the 1967 catalogue, in which he stated that "Post-Impressionist" paintings had been acquired under a "policy" by the Met "to select works that seem to have enduring quality."

107.    Apart from these published reports, the exact details, terms and location of the 1972 transactions have been largely concealed. While the Met maintains records in its archives regarding Rousseau's tenure (including the time before the Met obtained the Painting in 1956 and when it purported to sell it in 1972), it has prohibited public access to some of them until 2073 (100 years after Rousseau's death). Upon information and belief, this restriction was imposed, in part, to conceal the purchase and sale of the Painting.

**The Purchase, Transfers and Other Efforts by the Goulandris Family and Entities to Obscure the Ownership and Location of the Painting**

108.     Upon information and belief, in 1972, Basil (either individually or with Elise) acquired the looted Painting for the Goulandris family's private collection.

109.     The Goulandris family has extensive ties to New York.

110.     Since acquiring the Painting in 1972, through a series of transfers, the Goulandris family and its related entities have hidden and obscured the Painting's ownership and location from Plaintiff.

111.     These transfers of the looted Painting took place, in whole or in part, in New York, by persons acting on behalf of the Goulandris Defendants in New York, or while one or more of the Goulandris Defendants maintained residences and worked in New York.

112.     In 1985, Basil entered into an agreement to sell 83 of his artworks, including the Painting, to Wilton Trading S.A., an offshore company owned and controlled by his sister-in-law Maria Goulandris ("Maria") and her son Peter.

113.     Upon information and belief, at the time of the transaction, Maria and Peter maintained residences in New York.

114.     Upon information and belief, that agreement, entered into on May 27, 1985, provided that the purchase price for the artworks would be $31.7 million and that the sale and transfer of the works would be effective as of May 27, 1988.

115.     On May 27, 1988, the sale and transfer were effectuated in New York. On that day, a bill of sale was executed by Basil as the "Seller" and Denis Tseretopoloulos, on behalf of Wilton, as the "Purchaser" in New York. Both parties' signatures were witnessed and attested to by a New York notary public. The bill of sale stated that the sale and transfer shall be effective as of the close

of business of that day. Tseretopoloulos also signed a receipt on that same day accepting the sale and transfer in New York, with his signature notarized by a New York notary.

116.    Upon information and belief, in or around 1992, Wilton donated a group of paintings, including the Painting, to a Goulandris family foundation.

117.    Basil died in 1994, and Elise died in 2000.

118.    In 2003, the Stern family hired a German law firm, Von Trott zu Solz Lammek ("Von Trott") to try to locate and recover the looted Painting. Online research conducted by Von Trott suggested that the Painting was in hands of the Goulandris family and might be in possession of the BEG.

119.    On October 29, 2003, Von Trott wrote to representatives of the BEG on behalf of the Stern family, asserting the family's claim to the Painting and seeking information about its ownership, location and the possibility of restitution.

120.    In December 2003, Von Trott received a telephone response from Dr. Kyriakos Koutsomallis, who at that time was director of the BEG museum in Andros. Koutsomallis advised Von Trott that the Painting did not belong to the BEG, but to an unnamed trust. A month later, by letter dated January 27, 2004, an official of the BEG, Fleurette P. Karadontis, informed Von Trott to direct its October letter to the Sirina Foundation in Vaduz, Liechtenstein. Von Trott did so on February 3, 2004.

121.    On May 26, 2004, the attorney for the Sirina Foundation wrote to Von Trott, stating that the Painting "was acquired in 1972 from a renowned art gallery with unquestionable provenance for a significant purchase price, whereby the previous ownership of the Metropolitan Museum New York should be emphasized in particular." Notably, the attorney for the Sirina

Foundation **did not** confirm in this letter that the Painting was owned by or in the possession of the Sirina Foundation.

122.    From 2004 to 2006, Von Trott repeatedly contacted the Sirina Foundation's attorney by letter and by phone but was stonewalled and misled until the Sirina Foundation stopped replying. Subsequently, the Stern family, through its attorneys, considered the possibility of bringing a restitution claim against the Sirina Foundation, but the family could neither determine the whereabouts of the Painting nor whether the Sirina Foundation actually owned or possessed it.

123.    By email dated November 21, 2019, an attorney from Von Trott wrote to the auction house Christie's stating that she had received the most recent edition of Christie's magazine, which included an article celebrating the opening of the new BEG museum in Athens, Greece. The article prominently displayed a picture of the Painting. The attorney advised Christie's that the Painting had been looted from Hedwig and Fritz Stern.

124.    Upon information and belief, Christie's magazine was mailed out on or about October 28, 2019. Thus, the very first time anyone acting on behalf of Plaintiff learned of the actual location of the Painting was sometime after October 28, 2019.

125.    On or about March 2, 2021, the BEG published the provenance of the Painting on its website. The website duplicated the false provenance included in the Met's 1967 catalogue— omitting entirely the Sterns' ownership and the World War II-era transfers of the Painting. By this point, however, the BEG was aware of the Sterns' prior ownership of the Painting. In 2003, Von Trott had notified the BEG, on behalf of the Estate, of the Sterns' ownership, and in 2017, the Van Gogh Museum in Amsterdam published an essay that mentioned the Sterns' ownership of the Painting between 1935 and 1938. In relevant part, the provenance on the BEG's website states: "Dr. Alfred Wolff, Munich in 1912 and 1924 / J.K. Thannhauser, circa 1948." As for the current

possession, the provenance alleges, "Private collection, since 1972." However, the Goulandris family has effectuated several alleged transfers of ownership of the Painting since 1972.

126.    To this day, the Goulandris Defendants continue to conceal how and when the BEG came into possession of the Painting; the Stern family's ownership of the Painting from 1935 to 1938; and the facts that the Nazis looted the Painting from the Stern family, coerced the Sterns into selling it via a Nazi-appointed agent, and confiscated the proceeds of the sale.

127.    In 2022, Von Trott continued unsuccessfully to negotiate a resolution with the BEG.

128.    On December 15, 2022, Plaintiff and the other beneficiaries filed the California lawsuit.

129.    Upon information and belief, the looted Painting remains on display at the BEG museum with a false provenance.

**The Goulandris Family's and Entities' Contacts With New York**

130.    As set forth above, this Painting has been trafficked in and through New York repeatedly since 1948. In 1948, Thannhauser had the Painting shipped from France to New York and then sold it in 1955, in New York, to Astor. Astor sold it in New York to Knoedler. Knoedler sold it in New York to the Met. The Met sold it in New York to Marlborough, which then sold it to Basil. Basil later sold it in New York to Wilton. There can be no question that the claims in this case arise from the Defendants' transaction of business in New York.

131.    In addition to the specific acts relating to the Painting, the Goulandris Defendants have extensive additional contacts with New York.

132.    After World War II, Basil and Elise relocated to, resided in and worked from New York. Upon information and belief, they resided for many years in an apartment at 998 Fifth Avenue. Upon information and belief, they continued to use that apartment until their deaths.

133.    In 1946, Basil and his brothers founded Orion Shipping & Trading Co., Inc. ("Orion") which had a head office in New York. From New York, Orion managed large purchases of U.S. and Canadian-built ships, making New York a strategic center for its global shipping operations throughout the mid-20th century. Basil was also a member of the Board of Directors of the American Bureau of Shipping, which operated in and from New York and other U.S. cities. Upon information and belief, Basil was also involved in other New York businesses and continued to conduct business activities in and from New York up until his death.

134.    Upon information and belief, Peter for many years resided, and continues to reside, at 993 Fifth Avenue and other addresses in New York City and/or elsewhere in New York.

135.    Peter was an executive at Orion & Global Chartering Company. Upon information and belief, he was and continues to be a partner in a New York real estate company.

136.    Upon information and belief, although Peter obtained Bahamian citizenship, he continues to maintain and use his New York residence and performs business activities from New York, including activities as a member of the Board of Trustees of the BEG and, upon information and belief, as a beneficial owner of Wilton.

137.    The BEG also engages in business activities in New York.

138.    Basil and Elise Goulandris and the BEG have lent various artworks to exhibitions in New York, including:

Vincent van Gogh, Nature morte à la cafetière, acquired in 1972
Exhibition: New York, The Metropolitan Museum of Art, *Van Gogh in Arles*, 18
October - 30 December 1984, no. 29, ill. p. 75

Vincent van Gogh, Les Alyscamps, acquired in 1971
Exhibition: New York, The Metropolitan Museum of Art, *Van Gogh in Arles*, 18
October - 30 December 1984, no. 115, ill. p. 19

Pablo Picasso, Femme nue aux bras levés, acquired in 1976
Exhibitions: New York, Museum of Modern Art, *Pablo Picasso: A Retrospective*,
1 May - 30 September 1980, ill. 101; New York, Museum of Modern Art,
'Primitivism' in 20th Century Art: Affinity of the Tribal and the Modern, 5
September 1984 - 15 January 1985, ill. p. 269

Paul Cézanne, Portrait de l'artiste regardant par-dessus son épaule, acquired in 1957
Exhibitions: New York, Wildenstein & Co., *Cézanne*, 5 November - 5 December
1959, no. 28 New York; The Metropolitan Museum of Art, *Paintings from Private
Collections* (Summer Loan Exhibition), 1962, no. 7

Paul Cézanne, La campagne d'Auvers-sur-Oise, acquired in 1958
Exhibition: New York, Wildenstein & Co., *Cézanne*, 5 November - 5 December
1959, no. 17, ill.

Joan Miró, La sauterelle, acquired in 1973
Exhibition: New York, Museum of Modern Art, Joan Miró, 17 October 1993 - 11
January 1994, no. 57, ill. p. 153

139.    The BEG uses and displays images of the Painting in digital media in New York

for the purposes of soliciting visitors from New York to travel to Greece to visit the museums of

the BEG.

140.    The BEG offers for sale to New York customers merchandise which prominently

depicts images of the Painting, such as tote bags, mugs, holiday ornaments, clothing, iPad covers,

computer mouse pads, and a wide variety of other items, in its online shop on its interactive website

for which it offers "worldwide shipping."

141.    The BEG uses its interactive website to offer "memberships" to residents of New

York from which they receive regular newsletters, free access to exhibitions, participation in

events, tours, and discounts.

142.    The BEG sells copies of its publications to libraries and other customers in New

York through a distributor of academic publications.

143.    The BEG derives revenue and other benefits from these New York activities.

144.    The BEG has used the Painting in commerce in the U.S., in New York and outside of the U.S. with a significant effect in the U.S. and has benefited and profited from that use.

**FIRST CLAIM FOR RELIEF**
**(Replevin—Against The BEG)**

145.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 144 of this Complaint as if fully set forth herein.

146.    Plaintiff is the rightful owner and thus entitled to recover sole possession of the Painting.

147.    The Painting is a unique and irreplaceable work of art.

148.    Plaintiff has demanded the return of the Painting, which demand has been refused by Defendant.

149.    As a result, Plaintiff is entitled to the return of the Painting, or alternatively, compensation for its loss from Defendant.

**SECOND CLAIM FOR RELIEF**
**(Conversion—Against All Defendants)**

150.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 144 of this Complaint as if fully set forth herein.

151.    Plaintiff is the rightful owner and thus entitled to recover sole possession of the Painting.

152.    Defendants each converted and appropriated the Painting to their own use in complete disregard and derogation of Plaintiff's right, title and interest to the Painting.

153.    As a result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial, but in excess of $75,000.

## THIRD CLAIM FOR RELIEF
### (Declaratory Relief—Against The BEG)

154.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 144 of this Complaint as if fully set forth herein.

155.    An actual case or controversy has arisen between Plaintiff and Defendant as to the ownership of the Painting.

156.    The Painting was unlawfully looted as a result of Nazi persecution and never returned to its rightful owner.

157.    Defendant does not have good title or any rights to the Painting.

158.    Plaintiff is the rightful owner and has demanded the return of the Painting.

159.    Defendant has unlawfully refused to return the Painting.

160.    Plaintiff is entitled to a judgment declaring that it is the rightful owner of the Painting and that Defendant has no right, title or interest in it.

## FOURTH CLAIM FOR RELIEF
### (Unjust Enrichment—Against All Defendants)

161.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 144 of this Complaint as if fully set forth herein.

162.    Defendants wrongfully possessed, used and benefited from the Painting.

163.    Defendants were enriched by their misappropriation of Plaintiff's ownership rights to the Painting and by any proceeds received therefrom or compensation related thereto.

164.    As a result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be determined at trial, but in excess of $75,000.

## FIFTH CLAIM FOR RELIEF
### (Constructive Trust—Against The BEG)

165.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 144 of this Complaint as if fully set forth herein.

166.    Defendant has wrongfully possessed, used and benefited from the Painting and is continuing to do so despite Plaintiff's demand for its return.

167.    As a result, Plaintiff is entitled to the imposition of a constructive trust on the Painting, obligating Defendant to return the Painting or compensate Plaintiff for its interest in the Painting, which interest is valued in an amount to be determined at trial, but not less than $75,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully pray for judgment against Defendants as follows:

(a)    Entry of judgment on all claims in favor of Plaintiff;

(b)    Judgment declaring Plaintiff to be the sole owner of the Painting entitled to all rights, title and interest thereto;

(b)    An order directing the BEG to return the Painting to Plaintiff;

(d)    Imposition of a constructive trust upon the Painting;

(e)    Restitution of the Painting to Plaintiff or its equivalence in value;

(f)    Damages for the conversion of the Painting and for taking and detaining it in an amount to be determined at trial, which is in excess of $75,000;

(g)    Punitive damages;

(h)    Pre- and post-judgment interest, to the fullest extent assessable at law or in equity on all damages;

(i)    Reasonable attorneys' fees, costs and expenses;

(j)    Such other further relief as the Court may deem just and proper.

Dated:  October 27, 2025                    Respectfully submitted,


By: /s/ *Lawrence M. Kaye*
_____

Lawrence M. Kaye
Yaél M. Weitz
Kate W. Aufses
**FREEDMAN NORMAND FRIEDLAND LLP**
10 Grand Central
155 East 44th Street, Suite 915
New York, New York 10017
Tel: (646) 974-0513
Fax: (212) 545-3331
lkaye@fnf.law
kaufses@fnf.law
yweitz@fnf.law

*Attorneys for Plaintiff Judith Anne Silver, Special*
*Administrator of the Estate of Hedwig E. Stern*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2025, the foregoing Complaint and Demand for Jury Trial was filed electronically with the Clerk of the Court using the CM/ECF system, which shall send notice to all counsel of record.

/s/ *Lawrence M. Kaye*
Lawrence M. Kaye
